## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEMBERG LAW, LLC,

               Plaintiff,

v.

EGENERATION MARKETING, INC.;
CHRISTOPHER G. IANNELLA; DANIEL
F. MUMMOLO AND DOES 1-10
INCLUSIVE,

               Defendants.

Civil Action No.
3:18-cv-570 (CSH)

**MAY 29, 2020**

## RULING ON DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT [DOC. 20] AND MOTION TO DISQUALIFY APPEARING COUNSEL FOR PLAINTIFF AND THE PLAINTIFF LAW FIRM [DOC. 39]

**Haight, Senior District Judge:**

## I. BACKGROUND

In this action for unfair business competition, Plaintiff Lemberg Law, LLC (herein "Plaintiff" or "Lemberg Law") seeks to recover damages arising from Defendants' operation of a website called "stopcollections.org" ("Website").[1] Defendant eGeneration Marketing, Inc. ("eGeneration") operates the Website for the purpose of "matching lawyers who focus their practice on filing claims under the federal Fair Debt Collection Practices Act ("FDCPA")[, 15 U.S.C. § 1692, *et seq.*,] with consumers who are interested in engaging a lawyer for assistance with such a claim." Doc. 39-1, at 2.

In Plaintiff's First Amended Complaint (also herein "FAC"), the currently operative

---

[1] Defendants in this action include eGeneration Marketing, Inc., and its President, Christopher G. Iannella, and CEO, Daniel F. Mummolo. Doc. 1, ¶¶ 4-6. They will be referred to collectively herein as "Defendants." eGeneration's principal place of business is located at 326 A Street, Unit 1A, Boston, Massachusetts. *Id.* ¶ 6.

complaint, Lemberg Law states that it is a "limited liability company" with its principal place of business located in Wilton, Connecticut. Doc. 19, ¶ 3.  It operates as "a consumer law firm" that represents clients in FDCPA cases. *Id.* ¶ 11.  Lemberg Law alleges that it has advertised its legal services related to FDCPA for over 12 years and has done so by maintaining websites at www.lemberglaw.com and www.stopcollector.com, which advertise their legal services nationwide, including the Connecticut market, with respect to FDCPA claims and other consumer law claims. *Id.* ¶¶ 12-13.

In contrast, eGeneration, a company in the business of generating leads for lawyers and law firms with respect to FDCPA claims, is not a law firm but allegedly "holds itself out, by and through its Website (www.stopcollections.org), as a provider of legal service with respect to FDCPA claims." *Id.* ¶¶ 14-15.

Plaintiff alleges that through its Website, eGeneration markets to actively solicit potential FDCPA clients, thereby "substantially affect[ing] interstate commerce." *Id.* ¶¶ 16-17.  Moreover, Plaintiff points out that eGeneration's Website "offers '100% free legal consultation' relating to debt collectors and harassment" and "include[s] a separate header for 'FDCPA.'" *Id.* ¶ 22.  Plaintiff alleges that such advertising is "specifically designed to deceive and mislead consumers into believing that Defendants are lawyers and/or are providing legal services in relation to FDCPA claims." *Id.*

In its FAC, Lemberg Law sets forth two claims against eGeneration: (1) violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.,* by false advertising, such as "false and misleading statements of fact regarding the nature of Defendants' services and their status as attorneys," Doc. 19, ¶¶ 71-83; and (2) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*, by, *inter alia*, asserting "false and misleading advertising statements" that "actually

deceive and/or have a tendency to deceive a substantial segment of Plaintiff's customers and potential customers," so procure an unfair competitive advantage for eGeneration, *id.* ¶¶ 85-87.  In its prayer for relief, Lemberg Law asks the Court for injunctive relief to prevent Defendants from continuing to advertise in the Connecticut market; an accounting of any and all gross revenues derived by Defendants due to advertising in the Connecticut market; money damages for all economic loss caused by violation of the Lanham Act, CUTPA, and Connecticut common law; an injunction against Defendants as to all "advertising of illegal lead selling services;"  reasonable attorneys' fees, treble damages, and costs of this action pursuant to 15 U.S.C. § 1117(a); and punitive damages. Doc. 19, at 18-19 ("Prayer for Relief," ¶¶ 1-9).

Currently pending before the Court are two motions filed by Defendants eGeneration Marketing, Inc., Christopher G. Iannella, and Daniel Mummolo (herein "Defendants").[2]  The first is a motion to dismiss "[e]ach of the two counts of the [Amended ] Complaint . . . because Plaintiff's two core contentions [in their FAC] are fatally flawed."  Doc. 20, at 1.  Defendants argue that the first such flawed contention is that the Website is actionable under Section 43(a)(1) of the Lanham Act because it allegedly deceives and misleads consumers into believing that Defendants are lawyers and/or provide legal services.  *See* Doc. 19 ( First Amended Complaint), ¶ 22.  Rather, Defendants assert, "plain-language statements" expressly state that "Website operators are not lawyers and the Website connects users with independent lawyers who provide free consultations." Doc. 20, at 1. The second allegedly flawed contention is that the Website violates Section 43(a)(1) because it does not comply with attorney advertising rules.  Such a contention is false, say Defendants, because an

---

[2]    According to the First Amended Complaint, Christopher G. Iannella is "owner, shareholder, President and director of [eG]eneration Marketing, Inc." and Daniel F. Mummolo is "owner, shareholder, CEO and director of [eG]eneration Marketing, Inc."  Doc. 19, ¶¶ 5-6.

alleged violation of the Connecticut Rules of Professional Conduct is "not cognizable as a private cause of action" and thus cannot be a predicate for a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). *Id.* at 2.

Defendants' second motion is brought pursuant to Local Civil Rule 83.13, to "preclude Attorney Sergei Lemberg and all attorneys affiliated with [Lemberg Law] from representing the Plaintiff in the above-captioned matter." Doc. 39, at 1. In particular, Defendants argue that Sergei Lemberg and other members of the Plaintiff law firm should be "disqualified from representing their firm in the prosecution of this action because it is obvious that Attorney Lemberg, and possibly other lawyers in the same firm ought to be called as . . . witness[es] within the meaning of Rule 83.13 of this Court's Local Rules of Civil Procedure." Doc. 39-1, at 1 (internal quotation marks omitted).

The Court addresses both motions herein and resolves them in turn.

## II.  DISCUSSION

### A.  Defendants' Motion to Dismiss

#### 1.  *Standard of Review - Rule 12(b)(6), Fed. R. Civ. P.*

The standard of review for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "for failure to state a claim upon which relief can be granted," is set forth in the United States Supreme Court's seminal holding of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *Iqbal*, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570

(2007)).[3]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (citation omitted). *See also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) ("In general, our review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.").

A complaint challenged by a 12(b)(6) motion must be construed liberally. *See Rescuecom*

---

[3]  The Second Circuit has adhered consistently to the United States Supreme Court's "plausibility" standard set forth in *Iqbal*. *See, e.g.*, *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020)*, Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019); *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019); *Kolbasyuk v. Capital Mgmt. Servs., LP,* 918 F.3d 236, 239 (2d Cir. 2019)*.*

*Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009); *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  "A well-pleaded complaint will include facts that raise a right to relief above the speculative level." *Palin v. New York Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (citation and internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same).  Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). "Allegations are deemed 'conclusory' where they recite only the elements of the claim." *Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009). "They become implausible when the court's commonsense credits far more likely inferences from the available facts." *Id.* (citing *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009)).  In sum, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### 2.  *Count One: "False Advertising" - Violation of § 43(a)(1) of the Lanham Act*

#### a.  **Plaintiff's Basic Factual Allegations**

In Count One of the Amended Complaint, Plaintiff alleges that Defendants have violated § 43(a) of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, through false advertising.  In particular, Plaintiff alleges that Defendants have published "false and misleading" statements and omissions

on their Website. *See* 15 U.S.C. § 1125(a).[4]   Section 43(a) of the Lanham Act prohibits any person from, "in commercial advertising or promotion, misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting 15 U.S.C.A. § 1125 (a)(1)(B)).   Plaintiff thus plainly bases its allegations on the second of two distinct bases of liability under § 1125(a): false advertising.   *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

In particular, Plaintiff alleges that Defendants' statements and omissions actually deceive the public, or have a tendency to deceive a substantial segment of Plaintiff's customers and potential customers, into believing that "Defendants are lawyers and/or are providing legal services in relation to FDCPA claims." Doc. 19, ¶ 22.

In support of their claim, Plaintiff alleges the following facts in its FAC:

---

[4] The Lanham Act provides, in relevant part:

Any person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial   advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125 (a)(1)(A)-(B).

- "When a consumer searches for "debt harassment" on www.google.com, a paid ad for Defendants' Website appears above any other search results, advertising 'Debt Collection Harassment Speak With A Lawyer Free.'" Doc. 19, ¶ 18.

- Defendants advertise their Website in a Google paid ad which states "Harassment From Bill Collectors Contact Our Debt Lawyers Now . . .  Get up to $1,000 per violation. Find out how much you're owed. Free Evaluation. Protect Your Rights. 100% Free Evaluation. Secure & Confidential. No Fees Until You Win." *Id.* ¶ 19.

- On the opening page of their Website, Defendants state, "Receive a 100% FREE legal consultation" relating to debt collectors and harassment; that page also includes a separate header for the FDCPA.  *Id.* ¶¶ 21-22.  Consumers are then prompted to "Get Started" with obtaining "100% FREE legal consultation" by clicking a button to provide their personal contact information (name, phone number, email address, zip code and additional comments).  *Id.* ¶¶ 23-24.

- One may submit the request for consultation without scrolling below the fold at the bottom of the page.  *Id.* ¶ 26. However, if one does scroll, one reads, *inter alia*,  in bold print "**FDCPA legal representation is completely free regardless of whether you win or lose your case**." Moreover, "[t]he burden of payment to the attorney will fall on the debt collector if they [sic] are found guilty of a violation." *Id.* ¶¶ 27-28.

- If  one  scrolls to the bottom of the Website, one sees the heading, "Connect with a Lawyer." *Id.* ¶¶ 29-30.  Under that heading, it states that "this site was created to help people like you connect with lawyers who can file successful claims against debt collectors who have violated your legal rights. . . . Request a free evaluation of your case to be connected with a lawyer who can help ensure your rights are not further violated by predatory collection agencies." *Id.* ¶30.

- At the very bottom of the Website, there appears a sole and "inconspicuous disclaimer" –  "in a font size that is significantly smaller than the rest of the text on the Website" – that "Stopcollections.org is not a lawyer or a law firm," and "not an attorney referral service." *Id.* ¶¶ 33-34.  Rather, "[i]t is an advertising service paid for by the lawyers and advocates whose names are provided in response to user requests." *Id.* ¶ 29.

- This disclaimer is "not viewable when a consumer first visits the Website on a desktop internet browser; consumers must scroll all the way to the bottom of the Website to view it." *Id.* ¶ 35.  Therefore, in requesting a consultation, a consumer is "*not* required to actually view the contents of the disclaimer," only to provide his or her case and contact information at the top of the Website. *Id.* ¶ 36 (emphasis in original).

From these alleged facts, Plaintiff concludes: "Taken as a whole, along with Defendants' [G]oogle advertisements, the Website was designed with the intent of deceiving consumers into believing they are dealing with a law firm who can help them with their FDCPA claims, when in reality the Defendants are really trolling for clients for unidentified lawyers." *Id.* ¶ 37.

Additionally, Plaintiff asserts that other phrases, like the Website headline, "HARASSED BY CREDITORS? YOU COULD BE ENTITLED TO COMPENSATION" and the Google ad headline, "Contact Our Debt Lawyers Now," intentionally "lure[ ] a prospective customer into believing that he/she is dealing with a law firm when that is not in fact the case." Doc. 19, ¶¶ 38-40. Moreover, the photographic image on the front page of the Website of "a man and a woman in professional attire [*i.e.*, business suits] further impresses upon the visitor that the website belongs to a law firm licensed to offer legal advice." *Id.* ¶ 41.

As to liability, Plaintiff asserts that individual Defendants, Iannella and Mummolo, – owners, shareholders and officers of eGeneration – were actively and directly involved in the "design, creation, content and maintenance of [e]Generation's advertising campaign and the Website." *Id.* ¶¶ 44-45. Plaintiff states that, through this campaign and Website, the Defendants are allegedly "holding themselves out as lawyers and/or a law firm and offering legal services when they are in fact not lawyers, not a law firm and do not provide legal services."[5] *Id.* ¶ 46. Plaintiff concludes that in so doing, Defendants "are purposely and deliberately eschewing compliance with applicable cooperative advertising State rule." *Id.* ¶ 47.  They are allegedly engaged in "lead running" or "lead

---

[5]  As Plaintiff describes in its memorandum opposing Defendants' "Motion to Dismiss," "[t]he language and look and feel of the website is anything but an advertisement for a couple of guys from Boston selling leads to lawyers (a business with numerous ethical and legal pitfalls for the sellers and the buyers)." Doc. 22, at 3.

selling" on the internet – attracting "unsuspecting consumers to their website" and then "sell[ing] the leads to participating lawyers." *Id.*

As proof of Defendants' "lead" sales, Plaintiff includes in the FAC [Doc. 19] the text of an email from Alyssa Meyer, eLuminate eGeneration Marketing, to Attorney Sergei Lemberg,  dated December 15, 2016, in which Meyer solicits Lemberg Law to become a recipient of eGeneration's "lead generation services." Doc. 19,  ¶ 49.  In the email, Meyer states that "we generate exclusive FDCPA cases [sic] leads online and are looking for a firm like yours to partner with and send these potentials to." *Id.* The email further states that with "lead generation services," a law firm like Lemberg can "receive a steady flow of new potentials and retain new clients low cost-per-case." *Id.*

Based on  Defendants' Website, advertising, and email, Plaintiff alleges that Defendants are attempting to compete with licensed law firms for client acquisition online without complying with any rules or regulations. *Id.* ¶ 51.  In addition, according to Plaintiff, the Website is "intended to mislead and/or deceive the people of Connecticut and elsewhere that Defendants actively litigate FDCPA matters when in fact they do not."  *Id.* ¶ 52.

### b.  Defendants' Arguments to Dismiss

Defendants argue that Plaintiff's Lanham Act claim is fatally defective because it fails to fulfill the first prong of the Second Circuit's standard for such a claim, as articulated in *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014).  In *Merck*, the Second Circuit explained that the first factor a "plaintiff must . . . demonstrate [is] that the statement challenged is false" under one or two "theories" – "(1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." 760 F.3d at  255 (2d Cir. 2014) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir.

2001)).  In the words of Defendants, "Plaintiff's false advertising claim (Count I) must be dismissed as legally insufficient because Plaintiff has not plausibly alleged the first of [Merck's] five elements: that the Website is false within the meaning of section 43(a)."[6] Doc. 21, at 14.

Defendants explain that "Plaintiff's 'holding out' theory is not that EMI actually claims to be a law firm or to provide legal services for FDCPA claimants."[7] *Id.*  Moreover, "Plaintiff does not allege that any aspect of the Website is 'literally false as a factual matter." *Id.* at 14-15 (quoting *Merck*, 760 F.3d at 255).  Defendants describe Plaintiff's "holding-out" theory as alleging that even if the Website is "accurate," it "supposedly misleads visitors by somehow fostering an impression that they are 'dealing with' a law firm." *Id.* at 15 (citing Amended Complaint ¶¶ 37, 39).  Defendants conclude that Plaintiff must, therefore, plausibly allege that "even if not literally false, the Website

---

[6] Defendants argue solely at this time that Plaintiff has failed to plead the first necessary element of a § 43(a) claim, that of falsity.  However, they expressly "reserve their right to raise at a later time, if necessary, Plaintiff's failure to satisfy the other four elements required to establish false advertising liability under § 43(a)." Doc. 21, at 14 *n*.4.  Indeed, "[t]he defense of failure to state a claim is not waivable." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). *See also United States ex rel. Kolchinsky v. Moody's Corp.*, 238 F. Supp. 3d 550, 555 (S.D.N.Y. 2017) ("While Rule 12 provides that [ ] procedural defenses are waived if omitted from a pleading or pre-answer motion, a defendant cannot waive the more fundamental 12(b)(6) defense—that the plaintiff has no legal right to recovery in the first place."); *Neroni v. Zayas*, No. 3:13-CV-0127 LEK/DEP, 2015 WL 3544652, at *2 (N.D.N.Y. June 4, 2015)("Under Rule 12(h)(2), a party may raise a 12(b)(6) failure-to-state a claim defense that it omitted from an earlier motion, (1) in any pleading allowed or ordered under Rule 7(a); (2) by a motion under Rule 12(c); or (3) at trial.") (citing Fed. R. Civ. P. 12(h)(2)), *aff'd*, 663 F. App'x 51 (2d Cir. 2016). Nonetheless, if successive Rule 12(b)(6) motions are interposed to delay the proceedings–*e.g.*, where defendants knew of grounds for a 12(b)(6) motion but purposely failed to assert them in a prior such motion for purpose of delay–successive motions may  be disallowed.  *Walia v. Napolitano*, No. CV112512 (SJF) (SIL), 2017 WL 10378189, at *8 (E.D.N.Y. Dec. 4, 2017) (citing  *Gentleman v. State Univ. of New York-Stony Brook*, No. 16-CV-2012, 2017 WL 2468963, at *2 (E.D.N.Y. June 6, 2017)).

[7] Defendants refer to themselves collectively in their memorandum in support of their motion to dismiss as "EMI," which is an initialism or acronym for "eGeneration Marketing, Inc." Doc. 21, at 3.

nonetheless is 'likely to deceive or confuse consumers;" but "[a]s a matter of law, it is not." *Id.* (citing *Merck*, 760 F.3d at 255).

In general, Defendants assert that "when viewed in whole, no reasonable person could be misled by the wording on Defendants' Website." *Id.* They argue that case law in four Circuits, including the Second, has "confirmed the common-sense principle" that "a Lanham Act false advertising claim fails when an advertisement's truthful language, including that contained in a disclaimer, *dispels any misimpression it is alleged to give*." *Id.* (emphasis in original). Defendants thus maintain that "when no reasonable consumer could be misled by the language claimed to be false, as is the case here, the court should reject a false advertising claim at the threshold as a matter of law." *Id.*

Defendants then argue that this conclusion is best exemplified by a Third Circuit case, *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011), in which a "defendant's Puerto Rican rum was deceptively marketed under the name 'Havana Club' using Cuban cultural references," but "the label on the bottle expressly identified the product as 'Puerto Rican Rum.'" Doc. 21, at 15. Despite a survey showing that "a significant number of likely rum purchasers [would be deceived] into believing" the rum was Cuban, both the District of Delaware and the Third Circuit found that the accurate statements on the label clearly and truthfully provided the rum's origin so there was not deception. *See Pernod*, 702 F. Supp. 2d at 250-251; 702 F.2d at 247. Defendants thus conclude that both the District Court and the Third Circuit held that "because the rum was clearly identified as a product of Puerto Rico, Cuban-themed labeling and promotion could not mislead consumers into believing it was produced in Cuba." *Id*. at 16.

Defendants credit the Third Circuit's analysis in *Pernod* as establishing "two common-sense

principles": (1) "unambiguous plain language can warrant disposing of a false advertising claim as a matter of law" and (2) "explicit clarifying language can be dispositive as to whether an advertisement is 'misleading' under Section 43(a)(1)." *Id*. at 17.   Defendants assert that "[t]hese principles are fatal to Plaintiff's Section 43(a) claim" because "the unambiguous statement on the Website that 'stopcollections.org is not a lawyer or law firm' renders Plaintiff's 'holding out' theory untenable." *Id.*  Specifically, "[e]ven if the Website's 'look and feel' somehow risked creating the impression that EMI is a law firm or that it litigates FDCPA matters, 'we are not dealing with [the Website's alleged look and feel] in isolation,' but rather in the context of its explicit statements, too." *Id*. at 18 (quoting *Pernod*, 653 F.3d at 252) (brackets in original).  According to Defendants, because the Website stated "in no uncertain terms" that EMI "is not a lawyer or law firm" and that "interested users are contacted by 'an independent lawyer or advocate' to evaluate their potential FDCPA claims," the Website could not mislead a reasonable consumer. Doc. 21, at 18 (citing *Pernod*, 653 F.3d at 253).

Perhaps in unstated recognition of the fact that this Court is not bound by the Third Circuit, Defendants then discuss a Second Circuit case, *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 30 F.3d 348 (2d Cir. 1994), as authority for the proposition that a district court "should  when appropriate, resolve a § 43(a) false advertising claim on the plain language of the advertisement." Doc. 21, at 18.  As described by Defendants, in *Forschner*, the plaintiff importer of high-quality Swiss-made pocketknives contended that defendant's use of the phrase "Swiss Army knife" in connection with its poorly-crafted Chinese-manufactured knife was false advertising.  *Id*. at 19 (citing *Forschner*, 30 F.3d at 351-52).  Defendants explain that in finding for the plaintiff, the district court looked at a consumer survey, which showed that a significant portion of consumers held the

misimpression that the knives were Swiss-made. *Id.* However, says Defendants, the Second Circuit reversed when it noted that the main blade of the knives was marked "STAINLESS/CHINA" and the packaging expressly stated, "Made in China." *Id.* (citing *Forschner*, 30 F.3d at 351). Moreover, the Second Circuit noted that the phrase "Swiss Army knife" denotes that this is the type of knife associated with the Swiss Army, not that the knife was made in Switzerland. *Id.* (citing *Forschner*, 30 F.3d at 356). From the Second Circuit's reversal, Defendants argue that the Court in this matter should look to the Website's language to resolve Plaintiff's Lanham Act claim as a matter of law. *Id.*

As a second point, Defendants argue that "truthful disclaimers and explanations on the Website cannot be disregarded because of their placement or font size." *Id.* at 21. Therefore, Defendants maintain that Plaintiff's statement that the "Website's explanations and disclaimers are not conspicuous enough" is simply an attempt to salvage its Lanham Act claim. *Id.* Citing the case of *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013), Defendants argue that "under proper circumstances, a disclaimer defeats a claim of deception." *Id.* Defendants assert that this is such a case because Plaintiff "must torture the Website to make [its argument]," such as the allegation that "the simple act of scrolling down . . . [is] somehow beyond the ken or capability of the average person looking for information on the internet." *Id.* Moreover, the size of the disclaimer's font "in fine print" and "at the bottom of individual pages" or visible through a hyperlink is not an "unusual" practice on the internet. *Id.* at 21.

Similarly, Defendants argue that "when viewed in whole" and "as a matter of law," "no reasonable person could be misled by the image [of individuals in 'professional attire'] on Defendants' Website." Doc. 21, at 29. Defendants assert that the individuals shown are "dressed

14

respectably" but the man is "not wearing a tie" and those depicted are not holding "briefcases, books, legal pads or other indicia of the legal profession." *Id.* Moreover, even if the figures shown do appear to be lawyers, "no reasonable viewer could reach such an understanding in the face of the Website's explicit statement that EMI 'is not a lawyer or law firm' and that inquiries are routed to 'independent lawyer[s and] advocate[s].'" *Id.* (citing Ex. C [Doc. 21-3] (webpage with image of male wearing a black suit and female wearing a gray suit and a bun in her hair, both with arms crossed).

In support of their argument that images may be clarified by text, Defendants cite, *inter alia*, a Sixth Circuit case, *Wysong Corp. v. APN, Inc.*, 889 F.3d 267 (6th Cir. 2018), in which dog food packaging, showing "delicious-looking lamb chops[,]… chicken breasts, T-bone steaks, and salmon fillets," was held not to be misleading because, "notwithstanding the images, the packaging explicitly "list[ed] various kinds of animal 'meal' or 'by-product' as an ingredient." *Id.* at 20-21 (citing *Wysong Corp*. 889 F.3d at 272). Defendants conclude that decisions like *Wysong* "confirm that the 'professional attire' image on the Website cannot overcome the clear, repeated and unambiguous disclaimer and explanations that stopcollections.org is not a law firm." *Id.* at 30. Accordingly, Defendants maintain, Plaintiff has "not adequately pled its Lanham Act Section 43(a) false advertising claim." *Id.* at 31.

### c. **Analysis**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), provides that "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

The Second Circuit has clarified that "[t]o establish false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the plaintiff must first demonstrate that the statement in the challenged advertisement is false." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014). A false advertising claim may be based on one of two "theories." *Id.* (citing *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir.2010)).

"Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *Merck*, 760 F.3d at 255 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (internal quotation marks omitted). Additionally, to prove falsity, the plaintiff must "show that the defendants misrepresented an inherent quality or characteristic of the product, the defendant placed the false or misleading statement in interstate commerce, and . . . the plaintiff has been . . . injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Id.* (citations and internal quotation marks omitted).

Whether an act or practice is deceptive or misleading is decided under an objective standard, which requires "a showing that a reasonable consumer would have been misled by the defendant's conduct." *Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955, at *22 (E.D.N.Y. July 21, 2010). Moreover, courts should "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole;" the "entire mosaic" is "viewed rather than each tile

separately." *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) (citations and internal quotation marks omitted).

Additionally, the Second Circuit has stated that "under certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) (per curiam).  *See also  Dependable Sales & Serv., Inc. v. Truecar, Inc.*, No. 15-CV-1742 (PKC), 2016 WL 79992, at *4 (S.D.N.Y. Jan. 6, 2016).

On the other hand, as Plaintiff points out in its opposition brief, Doc. 22, at 16, a "disclaimer or contradictory claim placed in an ad will not remedy an ad, which is misleading, *per se.*" *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 906 F. Supp. 178, 182 (S.D.N.Y. 1995), *aff'd*, 100 F.3d 943 (2d Cir. 1996). If a disclaimer is sufficiently inconspicuous due to its location or font, it may fail to cure other misleading statements. *Id.* In particular, "a footnote or disclaimer that purports to change the apparent meaning of the claims and render them literally truthful, but which is *so inconspicuously located or in such fine print* that readers tend to overlook it, will not remedy the misleading nature of the claims." *Id.* (emphasis added)(citation and internal quotation marks omitted). *See also Am. Home Prod. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987) (same); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827–28 (9th Cir. 2011) (disclaimer failed to cure misleading statements on website because it "was easy to miss because it was displayed in small font at the bottom of each page, where many consumers would never scroll.").

A disclaimer is thus considered in the overall context of the advertisement. *See, e.g., Fink*, 714 F.3d at 742 ("[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226,

254 (S.D.N.Y. 2005) (concluding in a motion for preliminary injunction that "[t]he few words of disclaimer are lost when the ads are considered as a whole") (Chin, *J.*).

With respect to *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011),  cited by Defendants, aside from the fact that this is persuasive authority at best, it may be distinguished on the facts. In that case, not only did the rum's label clearly state that it was a "Puerto Rican Rum" but the district court found, and the Third Circuit affirmed, that the "Havana Club rum" actually "ha[d] a Cuban heritage and, therefore, depicting such a heritage [was] not deceptive." 702 F. Supp. 2d at 251-52.  The court noted that Bacardi was "originally a Cuban company" and had acquired the "Havana Club rum recipe" from the Arechabala family in Cuba.  *Id.* at 252.  The First Amendment therefore  "protect[ed] defendant's ability to accurately portray where its rum was historically made – as opposed to claiming that the product [was] still made there."  *Id.* (citing *Piazza's Seafood World, LLC v. Odom,*  448 F.3d 744,  753 (5th Cir. 2006) (commercial speech is protected when it concerns lawful activity and is "not misleading")).

Unlike in the case at bar, the plain label of the rum in *Pernod* was accurate on its face in that defendant's Havana Club rum actually had a "Cuban heritage" as "derived primarily from the Arechabala recipe;" and the Havana Club rum label "truthfully (and prominently) provide[d] the geographic location of the product's manufacture (Puerto Rico)" so the labeling was "neither false nor misleading."  702 F. Supp. 2d at 353. As the Third Circuit clarified:

> Here, there is *a factually accurate, unambiguous statement* of the geographic origin of Havana Club rum. The label clearly states on the front that the liquor is "Puerto Rican Rum" and, on the back, that it is "distilled and crafted in Puerto Rico." No reasonable consumer could be misled by those statements, and the rest of the label does not put those statements in doubt.

*Pernod Ricard*, 653 F.3d 241, 252 (3d Cir. 2011)  (emphasis added).  In contrast, as alleged by

18

Plaintiff,  the stopcollections.org Website poses a greater level of ambiguity as to its source.

"[W]hat a reasonable consumer would believe often raises a factual dispute that cannot properly be resolved on a motion to dismiss." *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-2413, 2013 WL 4647512, at *13 (E.D.N.Y. Aug. 29, 2013).  Accordingly, whether a disclaimer effectively turns an otherwise false advertisement into a true one is a matter of fact, which may not, in many circumstances, be properly decided on a Rule 12(b)(6) motion to dismiss.  "While a disclaimer may be so plain, clear and conspicuous as to bar a claim as a matter of law, this is not [always] the case." *Dependable Sales & Serv.*, 2016 WL 79992, at *5.  *See also Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014)("[T]he Court cannot hold as a matter of law that the product labels are not misleading to a reasonable consumer."); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 464 (E.D.N.Y. 2013) ("At this early stage of the litigation, it cannot be determined whether a disclaimer on the back of [defendant's] products . . . eliminates the possibility of a reasonable consumer being misled . . . .").

The Second Circuit has also held that "disclaimers in themselves are not dispositive with respect to alleviating consumer confusion."  *Hughes v. Design Look Inc.*, 693 F. Supp. 1500, 1507 (S.D.N.Y. 1988) (citing *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987) and *Charles of the Ritz Grp. Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1324 (2d Cir. 1987)). As the Second Circuit explained in *Home Box Office*, "[a]lthough we have found disclaimers to be adequate in certain cases, each case must be judged by considering the circumstances of the relevant business and its consumers."  832 F.2d at 1315. In other words, "the use of disclaimers [may]  be an adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion." *Id.*  However, where, for example, "the disclaiming information does

19

not appear in sufficiently close proximity to the infringing statements," the alleged infringer may be required to "demonstrate the effectiveness of proposed disclaimers." *Id.* (describing Showtime's use of a disclaimer as "especially problematic" where there was an allegedly false statement "on its back panel and a disclaimer only appearing on an inside panel").

It thus follows that in a false advertising claim, where there is a disclaimer included to allegedly avoid consumer confusion, that disclaimer may, upon factual consideration, be held "insufficient as a matter of law" depending on its size and location. *See, e.g., Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 629 (S.D.N.Y. 1985) (holding disclaimer insufficient as a matter of law where it appeared "in tiny print at the bottom of the page" so was "unlikely to be noticed by most readers" of the magazine at issue). To be effective, a disclaimer must be sufficiently bold and clear to dispel any conflicting false conclusions. *Id. See also Prudhomme v. Procter & Gamble Co.*, 800 F. Supp. 390, 394 (E.D. La. 1992) ("The mere existence of a disclaimer will not preclude a finding of consumer confusion. The disclaimer should be carefully analyzed in determining effectiveness.") (citations omitted).

On a 12(b)(6) motion to dismiss, courts often cannot make a factual determination as to whether the disclaimer by defendants "effectively turns an otherwise false advertising claim into a true one, in such a manner that the consumers are not misled," *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1195 (S.D.N.Y. 1987), or whether "[t]he few words of disclaimer are lost when the ads are considered as a whole," *McNeil-PPC, Inc. v. Pfizer Inc.*, No. 04 Civ 7684, Trade Reg. Rep. ¶ 74674, 2005 WL 8012018 (S.D.N.Y. Jan. 6, 2005) (Chin, *J.*). In cases alleging "false advertising," "the parties should be able to submit evidence to demonstrate whether a reasonable consumer would find the labeling on the subject [product] to be deceptive." *Yumul v. Smart Balance,*

*Inc.*, 733 F. Supp. 2d 1117, 1129 (C.D. Cal. 2010) (internal citations and quotation marks omitted).

*See also   Stoltz v. Fage Dairy Processing Indus., S.A.,* No. 14-CV-3826 (MKB), 2015 WL 5579872,

at *20 (E.D.N.Y. Sept. 22, 2015) ("While Defendants' arguments [that a reasonable consumer would

not be misled by the labeling/advertising at issue] . . . may ultimately prevail, the allegations in this

case do not present the type of patently implausible claim that warrants dismissal as a matter of law

based on the reasonable consumer prong.")

       In the case at bar, on the stopcollections.org Website, the disclaimer appears at the very

bottom of  Defendants' website in a tiny font.  It would be reasonable for a consumer, noting the

large headline toward the bottom of the page, "Connect with a Lawyer," to overlook the significantly

smaller disclaimer that the site "is not a lawyer or law firm" and "not an attorney referral service."

It is also possible to find that even if a consumer read the disclaimer, he or she might become

confused by the instruction, "[t]o find out the attorney or advocate in your area who is responsible

for the advertisement, click here."  In other words, a reasonable consumer might believe that he or

she was about to reveal the names of the attorneys who own the website because they are

"responsible for the advertisement."

       Also, at the top of the Website, one is boldly provided (in an orange rectangle) with an

opportunity to "Get Started" in obtaining an FDCPA attorney by filling in certain contact information

to "Get Help."  In truly tiny font, under that form of contact information there is the sentence: "By

submitting above, I agree to the privacy policy and disclaimer . . . ."  Both the "privacy policy" and

"disclaimer" are hyperlinks so that one must click on the disclaimer link to finally reveal the truth

about the site in a plainly readable font.  However, a reasonable consumer, plagued by debt collectors

and eager to "Get Help," might fail to click on that tiny link, which is arguably not noticeable in that

it is printed in white ink against a navy blue background.

Because of the "disclaimer" link's tiny font, location, and white color, the Court cannot determine whether that link adequately corrects any confusion which may arise as to the source of the Website at this early stage.  Unlike *Pernod Ricard*, a case heavily relied upon by Defendants, the disclaimer does not appear boldly and up front; and there is no factual basis to find an alternate interpretation of the advertisement as true – that is, that the site is really owned by lawyers instead of "an advertising service" that generates leads.[8]

Rather, in compliance with Second Circuit precedent, the disclaimer at issue should be considered in the overall context of the advertisement, *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013).  Thus, whether the Defendants' disclaimer effectively cures an otherwise misleading advertisement is  a matter of fact, which may be an improper determination on a Rule 12(b)(6) motion to dismiss, *Dependable Sales & Serv.*, 2016 WL 79992, at *5.[9]  *See also Stoltz v.*

---

[8]  In *Pernod*, the Third Circuit recognized that prominently displayed language, which is plainly legible, may not mislead or confuse consumers.  It thus held that "[t]he label [of the rum at issue] clearly states on the front that the liquor is 'Puerto Rican Rum' and, on the back, that it is 'distilled and crafted in Puerto Rico.' No reasonable consumer could be misled by those statements, and the rest of the label does not put those statements in doubt." 653 F.3d at 252. In a footnote, the Court further clarified:

> *We do not, nor need we, address the situation in which the statement* of the geographic origin *in an advertisement is contained in fine print*. The portions of the label that put the meaning of the advertisement beyond reasonable dispute here are plainly legible. Moreover, the phrase 'Puerto Rican Rum' is particularly prominent on the front of the bottle.

*Id.* at n.13 (emphasis added).

[9]  Similarly, as to the argument regarding whether the images of a man and woman dressed in "professional attire" appear to be lawyers in the absence of briefcases, books, legal pads, etc., this too seems to be a question of fact to be considered in the overall context of the Website. In the Sixth Circuit case cited by Defendants,  *Wysong Corp. v. APN, Inc.(17-1975)*, 889 F.3d 267, 271 (6th Cir. 2018), the Court stated that "[a]t the motion-to-dismiss stage, in the absence of such surveys

*Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826 (MKB), 2015 WL 5579872, at *16 (E.D.N.Y. Sept. 22, 2015) (In denying the motion to dismiss, the Court held that "the mere inclusion of an accurate disclaimer does not necessarily cure other potentially misleading statements or representations set forth in a label or advertisement" and that instead, "the significance of a disclaimer depends upon factors such as the font size and placement of the disclaimer as well as the relative emphasis placed on the disclaimer and the allegedly misleading statement.") (citations omitted).

In sum, Count I of the First Amended Complaint contains sufficient factual allegations to plausibly demonstrate "falsity" or the likelihood "to deceive or confuse customers," *Merck*, 760 F.3d at 255. Specifically, the Website has a potential likelihood of confusing or misleading consumers about its true nature and its proprietors. Whether a reasonable consumer who searched for "debt harassment" on Google, and then seeks a free legal consultation on the Website, would understand that the Website is not actually advertising legal services provided by the operators of the Website, is an issue of fact that cannot be decided at this stage. The Court is not persuaded that it can be concluded at this time that "no reasonable person could be misled by the wording on Defendant's website." Doc. 21, at 15. Therefore, accepting all of Plaintiff's well-pled allegations of consumer confusion as true, the motion to dismiss Plaintiff's Lanham Act claim will be denied.

---

[showing that consumers were actually deceived], we ask whether the facts in the complaint support a plausible inference that the challenged advertisements in fact misled a significant number of reasonable consumers." To evaluate the plausibility of such a claim, "context matters" – *i.e.*, [b]oth the relevant market and the products' labeling are crucial." *Id.* at 272. Here, the website says in bold print, "Connect with a Lawyer." Moreover, directly next to the image of the man and woman in professional attire, it says, "Receive a 100% FREE legal consultation." There is also no explicit label to indicate that the individuals in the image are not attorneys who will provide the advertised consultation. Granted, a clear, repeated, and unambiguous disclaimer may negate an argument that an image is misleading; but whether the disclaimer is sufficient must be examined in the context of the entire advertisement. *See Fink*, 714 F.3d at 742.

### 3. Count Two:  Violation of CUTPA, Conn. Gen. Stat. § 42-110a, et seq.

#### a. Substance of Plaintiff's Allegations

As Plaintiff states in its brief in opposition to the motion to dismiss, "Plaintiff's CUTPA claim is based on the same theory as the Lanham Act claim: that Defendants' Website and Google ads advertising the Website, have a tendency to mislead and confuse consumers as to whether Defendants are in fact a law firm and lawyers advertising legal services and a legal consultation." Doc. 22, at 26. Plaintiff concludes that  "[a]ccordingly, for the same reasons that Defendants' Website is likely to confuse or mislead consumers under the Lanham Act, it is also likely to mislead consumers under CUTPA." *Id.*

Specifically, in the second Count,  Plaintiff alleges that Defendants have violated CUTPA in that their "false and misleading advertising statements and omissions . . . actually deceive and/or have a tendency to deceive a substantial segment of Plaintiff's customers and potential customers." Doc. 19, ¶ 85.  These deceptions, Plaintiff asserts, are "material" because they concern the "quality and/or characteristics of Defendants' services and are likely to influence the decisions of consumers." *Id.* Moreover, Defendants' acts and omissions are allegedly designed to "procure an unfair competitive advantage [against law firms] through false, misleading and deceptive advertising." *Id.* ¶ 86.  This allegedly false advertising has "injure[d] both consumers," who seek legal advice within Connecticut, and Plaintiff, who has lost opportunities to obtain clients for FDCPA cases.  *Id.* ¶¶ 86-87.

In support of the argument that Defendants have acted illegally or improperly in making such advertising statements and omissions, Plaintiff  incorporates allegations from the preceding "Factual Allegations" section of the First Amended Complaint.  Included, *inter alia*, among the incorporated

24

allegations are: "[c]onsumers in the Connecticut market would confuse Defendants' website with a law firm offering legal services;" Section 7.2 of the Connecticut Rules of Professional Conduct mandates that any advertisement for legal services "shall include the name of at least one lawyer admitted in Connecticut responsible for [the  ad's] contents;"[10] Defendants' actions in "soliciting cases for third party attorneys . . . are illegal in nature" pursuant to Conn. Gen. Stat. §§ 51-86 and 51-87; various other states (New York, Florida, Minnesota, Michigan, Maryland, Virginia, Texas, Illinois, California, Massachusetts) "have also found such solicitation of clients to be illegal;" and "Defendants have engaged in improper and/or illegal conduct by propagating false and misleading statements in their advertising."  Doc. 19, ¶¶ 55-58 (citations omitted).

### b.  Defendants' Arguments to Dismiss

Defendants argue that this CUTPA count should be dismissed from the Complaint because it fails to state a claim as a matter of law.  Defendants present two reasons for dismissal.  First, "insofar as Plaintiff alleges that Defendants are holding themselves out as lawyers and providers of legal services, those allegations are legally insufficient under CUTPA for the same reasons they are legally insufficient under Lanham Act [§] 43(a)." Doc. 21, at 31.  In particular, "[t]he very impressions Plaintiff contends are deceptive are dispelled by express statements that defendants are neither lawyers nor a law firm, and that the Website provides a 'connection' service." *Id.* In other words, Defendants' disclaimers on the Website sufficiently clarify that eGeneration is not a law firm, but rather "connect[s] lawyers to users seeking legal assistance with FDCPA matters." *Id.* at 32 (internal quotation marks omitted).  Moreover, the site states that "legal consultation is provided by

---

[10]  According to Plaintiff, "the Website does not name any lawyer admitted in Connecticut." Doc. 19, ¶ 31.  The only attorney referenced on the Website, Alaina Sullivan, is a sole practitioner who is based in Oxford, Michigan.  *Id.* ¶ 32.

the independent lawyer to whom the user is connected." *Id.* (internal quotation marks omitted). Defendants thus conclude that "[a]s a matter of law, these express, accurate descriptive statements leave no room for a reasonable user to form the misimpressions of which Plaintiff complains." *Id.* at 32-33.

The second basis upon which Defendants argue for dismissal of the CUTPA count is that Plaintiff alleges that the Website is "unfair" within the meaning of CUTPA "because its content . . . runs afoul of the advertising restrictions in the Rules of Professional Conduct (the 'RPC') applicable not to marketing firms, but to Connecticut licensed attorneys."  Doc. 21, at 33-34.  However, Defendant notes, "it is well settled in Connecticut that purported violations of the Connecticut Rules of Professional Conduct cannot, as a matter of law, form the predicate of *any* cause of action, including . . . one under CUTPA." *Id.* at 31 (emphasis in original); *see also id.* at 33-34 (citing *Noble v. Marshall*, 23 Conn. App. 227, 230 (1990)).

The Court examines the parties' arguments below.

### c.  Analysis

#### 1. CUTPA - Standard of Law

CUTPA broadly provides that "[n]o person shall engage in unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "The entire act is remedial in character; and must be liberally construed in favor of those whom the legislature intended to benefit." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492  (1995) (internal citations omitted).  "To state a claim under CUTPA, [a plaintiff] must plead that he (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce." *Edwards v. N. Am. Power*

*& Gas, LLC*, 120 F. Supp. 3d 132, 141 (D. Conn. 2015) (citing Conn. Gen.Stat. § 42–110g(a)).

"To determine whether conduct is unfair under CUTPA, Connecticut courts apply the cigarette rule and look to '(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, is it within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; [and] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].'" *Edwards*, 120 F. Supp. 3d at 141 (quoting *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227–28 (2010)). *See also Ulbrich v. Groth*, 310 Conn. 375, 409-10 (2013)*; Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14, 27-28 (2004). "A practice need not meet all three criteria to constitute an unfair practice under CUTPA," and may be found to be "unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Edwards*, 120 F. Supp. 3d at 141 (quoting *Naples*, 295 Conn. at 227). "Thus," under this standard, "a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Ulbrich*, 310 Conn. at 409 (citation omitted).

"An act or practice is actually deceptive under CUTPA when there is: (1) 'a representation, omission, or other practice likely to mislead consumers;' (2) the consumer 'interpret[s] the message reasonably under the circumstances;' and (3) 'the misleading representation, omission, or practice [is] material—that is, likely to affect consumer decisions or conduct.' " *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 288 (D. Conn. 2015) (quoting *Smithfield Assocs.,* 86 Conn. App. at 28 (internal quotation marks omitted)). Employing the necessary analysis, "[w]hether

27

a practice is unfair and thus violates CUTPA is an issue of fact" which is overturned on appeal only

when it is "clearly erroneous.'" *Smithfield Assocs.*, 86 Conn. App. at 28  (citations omitted).  *See,*

*e.g., Langan*, 95 F. Supp. 3d at 289 ("Whether the phrases on defendant's sunscreen packaging are

deceptive is a question of fact that is not readily susceptible to resolution on a motion to dismiss.").

The Connecticut Supreme Court has expressly stated that entrepreneurial aspects of the

practice of law, such as attorney advertising, fall  well within scope of CUTPA. *Suffield Dev. Assocs.*

*Ltd. P'ship v. Nat'l Loan Inv'rs, L.P.*, 260 Conn. 766, 782  (2002) (citing *Haynes v. Yale–New Haven*

*Hospital,* 243 Conn. 17, 34 (1997)).  As to such advertising, the Connecticut Supreme Court also

noted that the legislative history of CUTPA reveals an intended protection of more than just clients,

but rather of a "much broader class":

> According to Representative Howard A. Newman, who reported the CUTPA
> legislation out of committee to the House of Representatives, the act "gives honest
> businessmen great protection [against] deceptive or unscrupulous [businessmen] who
> by unfair methods of competition and deceptive advertising, etc., unlawfully divert
> trade away from law abiding businessmen." 16 H.R. Proc., Pt. 14, 1973 Sess., p.
> 7323.

*Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 497 (1995).  In the context of advertising by

professionals, a CUTPA claim must include an allegation that the advertisement is "unfair,

unconscionable or deceptive." *Vincent v. Essent Healthcare of Connecticut, Inc.*, 368 F. Supp. 2d

181, 185 (D. Conn. 2005) (quoting *Janusauskas v. Fichman*, 264 Conn. 796, 808  (2003)).

### 2.  *Plaintiff's CUTPA Claim*

Plaintiff's Count II for violation of CUTPA incorporates the allegations contained in the

complaint's  preceding paragraphs, ¶¶ 1 to 83, asserting that Defendant's false and misleading

advertising statements and omissions "actually deceive and/or have a tendency to deceive a

substantial segment of Plaintiff's consumers or potential consumers." Doc. 19, ¶¶ 84-85. In particular, Plaintiff alleges that Defendants' representations on their Website are likely to mislead consumers as to the "quality and/or characteristics of Defendants' services." *Id.* ¶ 85.  According to Plaintiff, "by locating [the disclaimer] all the way at the bottom of the Website in a font size that is significantly smaller than the rest of the text on the Website," while encouraging consumers to "Receive a 100% FREE legal consultation" as a header, Defendants have intentionally deceived consumers into believing that their Website directly provides legal services. *Id.* ¶¶ 33-35. Moreover, Plaintiff maintains that given the location of the disclaimer at the very bottom of the Website, "[c]onsumers can request a 'consultation' from Defendants without ever viewing the disclaimer," and thus without knowing the truth about the identity of the service provider. *Id.* ¶ 36.  Lastly, the language on  the Website itself suggests Defendants' control over the legal services offered by offering "100% Free Legal Consultation" and further stipulating that "FDCPA legal representation is completely free regardless of whether you win or lose your case." *Id.* ¶¶ 27-28, 42.  This, according to Plaintiff, is particularly deceptive in that "in fact Defendants are neither licensed [as attorneys] nor capable of offering such a consultation." *Id.* ¶ 42.

Additionally, Plaintiff alleges that Defendants' Google ad headline, "Contact *Our* Debt Lawyers Now" implies that lawyers are the ones advertising, as opposed to a third-party referral service. *Id.*, ¶¶ 38-40 (emphasis added).   These banner statements urge consumers to contact the Website's debt lawyers now. Such language, accompanied by an image of individuals dressed in "professional attire," allegedly supports the illusion that this website belongs to "a law firm licensed to offer legal advice." *Id.* ¶ 40.

In total,  Plaintiff's allegations are sufficient to overcome the first basis for Defendants'

challenge to Plaintiff's CUTPA claim – namely, that no factual confusion exists.  For the reasons set forth *supra* in Part II.A.2.c. above, the  question of consumer confusion is properly a question of fact for later determination (*i.e.*, not on resolution of a Rule 12(b)(6) motion).

Specifically, Plaintiff alleges that Defendants' disclaimers, informing consumers that they do not constitute a law firm, are much less visible than the banner statements urging consumers to contact the Website's debt lawyers now.  Plaintiff also asserts that consumer confusion arises where the Website statements patently conflict.  In short, a reasonable consumer might interpret the main headings of the site and the pictured professionally-attired individuals to advertise a law firm's services regarding debt collection practices, whereas the disclaimers, printed in tiny font and inconspicuously displayed, state otherwise.[11]

As pled, these allegations regarding confusion suffice to state a CUTPA claim at this time. Construing the facts in the light most favorable to the Plaintiff for purposes of the present motion, this Court finds that the advertising conduct attributed to the Defendants – unfair, misleading, and deceptive statements and omissions – offends public policy and rises to the level of unethical behavior, bringing the alleged conduct within the purview of the remedial CUTPA statute.[12]

---

[11]  Defendants argue that the "Website leaves no reasonable room for confusion" and "need not beat the reader over the head with the explanations" that stopcollections.org is not a lawyer or law firm. Doc. 22, at 9.  However, for a disclaimer to be effective, a reasonable consumer has to be able to understand from the Website that it is not owned by lawyers or a law firm. As Defendants concede, the applicable standard is whether a reasonable consumer would be misled by the site. Where disclaimers appear at the bottom of the page, in tiny font, and/or are accessed through hyperlinks, one cannot find that Defendant is boldly presenting, much less overwhelming, the consumer with the relevant information.

[12]  The Court further notes that Plaintiff's FAC also alleges that Defendants' Website "causes substantial injury to consumers, [competitors or other businesspersons].'" *Edwards*, 120 F. Supp. 3d at 141.  Such injuries to consumers are allegedly "material" in that the Website misrepresents  the "quality and/or characteristics of Defendants' services" so is "likely to influence the decisions of

Second, as to Defendants' argument that the CUTPA claim may not proceed because it was predicated solely on a violation of Connecticut's Rules of Professional Conduct, Doc. 21, at 34 (citing *Noble*, 23 Conn. App. 227, [at 231]), it is clear that Plaintiff bases its claim on more than such a violation. As a threshold matter, in suing Defendants, Plaintiff does not suggest that this is a case of attorney misconduct. Clearly, the parties agree that Defendants are not attorneys, so cannot be held personally subject to rules of conduct governing the legal profession.[13]

Additionally, as Plaintiff asserts, "Plaintiff's CUTPA claim is based on Defendants' false and misleading representations that they are a law firm/lawyers that actually perform the legal services advertised"; and "[w]hether the Website is likely to mislead or confuse consumers can be decided without any reference to the Rules of Professional Conduct." Doc. 22, at 26. Plaintiff's false advertising CUTPA claim is "sufficient on its own without any reference to the Connecticut Rules of Professional Conduct." *Id*. at 28. In other words, this is a case where independent allegations state a claim for relief under CUTPA so that "mere references to the Rules . . . do not impact the viability of the CUTPA claims." *Id.* (citing *Park v. Kramer*, No. CV030475833S, 2004 WL 303898, at *2 (Conn. Super. Ct. Jan. 27, 2004) (holding that *Noble* stands for a "narrow holding that the

---

consumers." Doc. 19, ¶ 73. Also, Defendants have allegedly used their "false and misleading statements" on the Website to solicit potential FDCPA clients, thereby injuring Plaintiff by "causing a decline in revenue, loss of good will, and other harm in an amount to be determined at trial." *Id.* ¶ 80.

[13] In cases where the defendant is actually an attorney, Connecticut courts have recognized that "entrepreneurial aspects of the practice of law are covered by CUTPA." *Robert M. Elliot, P.C. v. Savalle*, No. HHDCV136045670S, 2014 WL 5472209, at *3 (Conn. Super. Ct. Sept. 30, 2014). In particular, "[t]he entrepreneurial aspects of legal practice [are] those related to: how the price of legal services is determined, billed and collected and the way a firm obtains, retains and dismisses clients." *Id.* (quoting *Stevenson v. McMillan*, No. CV040409731S, 2005 WL 704821, at *3 (Conn. Super. Ct. Feb. 24, 2005)).

Rules of Professional Conduct were not intended to create a private cause of action under CUTPA"
so that a claim with a basis "independent of any professional rules" lies "beyond the scope of
*Noble*)).

Instead of predicating its claim on a violation of the Rules of Professional Conduct, Plaintiff
explains that it "included references to the [Rules] in its Amended Complaint to provide additional
context surrounding Defendants' misrepresentations and illegal scheme." Doc. 22, at 26. As an
example, "Section 7.2(c) [of those Rules] provides that a 'lawyer shall not give anything of value to
a person for recommending the lawyer's services' and 7.2(d) provides that attorney advertisements
must 'include the name of at least one lawyer admitted in Connecticut responsible for its content.'"
*Id.* Through their Website, Defendants are being compensated for connecting particular lawyers with
consumers ("trolling for clients for unidentified lawyers"), and there is no Connecticut attorney
named on the Website. Doc. 19, ¶¶ 31-32, 37, 55.

As additional context regarding public policy, Plaintiff asserts that Defendants' conduct has
also violated Conn. Gen. Stat. §§ 51-86 and 51-87, and similar laws in other states. *Id.* ¶¶ 56-57.
These laws respectively prohibit the receipt of compensation for (1) soliciting the commencement
of an action for damages and for (2) bringing a cause of action or prospective client to an attorney
at law. Specifically, § 51-86 bars one "not admitted as an attorney in this state" from soliciting
another person to "cause an action for damages to be instituted" in return for compensation from that
person or his attorney. Conn. Gen. Stat. § 51-86(a). In addition, § 51-787 provides, in relevant part,
that "[a]ny person who knowingly receives or accepts any payment . . . for referring or bringing a
cause of action or prospective client to an attorney-at-law, or for inducing or influencing any other
person to seek the professional advice or services of an attorney, shall be guilty of a class E felony."

32

*Id.* 51-87(b). The State of Connecticut thus holds illegal the act of receiving compensation for soliciting another person to bring a lawsuit and for inducing another to seek an attorney's professional services.

In the case at bar, Plaintiff points out that Defendants have employed their Website to solicit consumers to bring debt harassment actions for compensation and/or to bring FDCPA claims and/or clients to attorneys for compensation. Plaintiff argues that, in so doing, Defendants have violated state law so that their advertisements are clearly improper and/or illegal. Even if violations of the Code of Professional Conduct do not, in and of themselves, give rise to civil liability, *Noble*, 23 Conn. App. at 231, conduct which conflicts with local rules and state laws may be viewed as offending public policy – falling "within at least the penumbra of . . . [an] established concept of unfairness." *Naples*, 295 Conn. at 227.

As described in the first factor of the "cigarette rule," a practice may be viewed as "unfair" without necessarily having been previously declared unlawful. *Edwards*, 120 F. Supp. 3d at 141 (quoting *Naples*, 295 Conn. at 227). It may offend "public policy as it has been established by statutes, the common law, or otherwise." *Id.* Alleged violation of professional rules and state statutes may thus support a finding that Defendants have acted unfairly, as recognized within the penumbra of "public policy;" and a violation of CUTPA may be established by showing "a practice amounting to a violation of public policy." *Smithfield Assocs.*, 86 Conn. App. at 27–28.

In addition, Plaintiff has alleged sufficient facts to make out a CUTPA claim under the second factor of the cigarette rule, alleging "deceptive" conduct, which may be viewed broadly as "immoral, unethical, oppressive or unscrupulous." *Edwards*, 120 F. Supp. 3d at 141 (citations omitted). In particular, Plaintiff alleges that Defendants' "advertising campaign is false, misleading,

33

and deceptive" in that "Defendants, who are not lawyers or a law firm, cannot provide any legal consultation, despite their claim in boldface type to the contrary." Doc. 19, ¶ 50. Moreover, such false and misleading advertising statements and omissions are allegedly "calculated to procure an unfair competitive advantage." *Id.* ¶ 86.

Based on these allegations, Defendants' advertising conduct may be construed as "deceptive" under CUTPA, comprised of representations and omissions "likely to mislead consumers," which are "material" because they are "likely to affect consumer decisions or conduct." *Edwards*, 120 F. Supp. 3d at 141–42. This conduct also allegedly "causes substantial injury to consumers, [competitors or other businesspersons]," *id.* at 141, in that "Defendants' advertising . . . has deprived and continues to deprive Plaintiff, and other consumer law firms, the opportunity to obtain prospective clients" who are "pursuing FDCPA claims," Doc. 19, ¶¶ 59-63. Such "substantial injury" falls within the third factor of the cigarette rule, supporting a claim that Defendants engaged in "unfair" conduct under CUTPA. *Edwards*, 120 F. Supp. 3d at 141

Lastly, without reference to any Rule of Professional Conduct, there is no question that Plaintiff has alleged "substantial injury to consumers," the third "cigarette rule" factor. Plaintiff repeatedly alleges that by confusing consumers, "Defendants' false and misleading advertising statements and omissions injure both consumers and Plaintiff," because consumers are not advised that their "FDCPA claims will be handled by lawyers and/or law firms other than Defendants." *Id.* ¶ 76; *see also id.* ¶ 85 ( alleging that Defendants' "deceptions are material" because they "concern the quality and/or characteristics of Defendants' services and are likely to influence the decisions of consumers").

As one Connecticut Superior Court explained in *Robert M. Elliot, P.C. v. Savalle*, No.

34

HHDCV136045670S, 2014 WL 5472209, at *3 (Conn. Super. Ct. Sept. 30, 2014), CUTPA "is not limited to providing redress only for consumers who can put a precise dollars and cents figure on their loss . . . as the ascertainable loss provision do[es] not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case."   Rather, " [d]amage . . . is only a species of loss . . . hence [t]he term 'loss' necessarily encompasses a broader meaning than the term 'damage'." *Id.*   Therefore, "[u]nder CUTPA, there is no need to allege or prove the amount of the actual loss." *Id.*

In sum, the fact that Plaintiff has indicated that eGenerations' conduct does not comport with Connecticut's Rules of Professional Conduct for attorneys does not mean that Plaintiff has failed to base its CUTPA claim on sufficiently offensive conduct.   In this advertising case, it is sufficient to allege facts to demonstrate that Defendants' conduct is "unfair, unconscionable or deceptive," *Vincent v. Essent Healthcare of Connecticut, Inc.*, 368 F. Supp. 2d 181, 185 (D. Conn. 2005) (citation omitted).   Plaintiff has repeatedly alleged unfair and deceptive conduct by Defendants in creating both the substance and locations of their representations on the Website.   Therefore, Defendants' second basis to dismiss this claim – predication upon a violation of Connecticut's Rules of Professional Conduct – is overly simplistic and fails to warrant dismissal of the claim.   Not only is eGeneration admittedly not a firm of lawyers (that is, not subject to the professional code), but there are ample material  bases upon which the present CUTPA claim rests– including, *inter alia*, deliberately misleading consumers as to the identities of providers of legal services advertised on Defendants' Website.

At the pleading stage, on a Rule 12(b)(6) challenge, the court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Peter*

*F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010).  Considering this motion under Rule 12(b)(6), the Court finds that Plaintiff's claim has facial plausibility.  Specifically, Plaintiff has sufficiently pled that Defendants have violated CUTPA by designing their Website to deceive legal consumers into believing that "Defendants are lawyers and/or are providing legal services in relation to FDCPA claims," Doc. 19, ¶ 22, when, in fact, they are allegedly engaged in "lead running" or "lead selling" on the internet – attracting "unsuspecting consumers to their website" and then "sell[ing] the leads to participating lawyers."[14] *Id.* ¶ 47.  To the extent that such consumers, possessing this mistaken belief, submit their information to stopcollections.org, Defendants have plausibly "procure[d] an unfair competitive advantage" by acquiring "a substantial segment of Plaintiff's customers and potential customers," who seek legal assistance regarding FDCPA matters. *Id.*, ¶¶ 85-86.  Defendants' motion to dismiss the CUTPA claim will be denied.

## B.  Defendants' Motion to Disqualify Counsel

### 1.  Legal Standard to Disqualify Counsel

"The objective of the disqualification rule is to 'preserve the integrity of the adversary process.'" *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)).  The decision to disqualify counsel is committed to the sound discretion of the district court, *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d

---

[14]  Defendant contends that there was no "false advertising" because the disclaimers that Defendant published on its website unambiguously prevent any reasonable person from being misled or confused.  In particular, because "the unambiguous statement on the Website that 'stopcollections.org is not a lawyer or law firm' renders Plaintiff's 'holding out' theory untenable." Doc. 21, at 17.  However, in conformance with Second Circuit precedent, a disclaimer is considered in the overall context of the advertisement, *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013).  Given the facts alleged, whether the disclaimer at issue effectively turns an otherwise false advertisement into a true one is a matter of fact is not a proper  determination on a Rule 12(b)(6) motion to dismiss, *Dependable Sales & Serv.*, 2016 WL 79992, at *5.

Cir.1990), and involves balancing "a client's right freely to choose his counsel against the need to maintain the highest standards of the profession," *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (internal quotation marks omitted).  In determining whether an attorney should be disqualified, the Court "looks to the binding precedent of the Second Circuit, with rules of professional conduct serving as a guide." *Rizzuto v. De Blasio*, No. 17CV7381 (ILG) (ST), 2019 WL 1433067, at *3 (E.D.N.Y. Mar. 29, 2019) (citing *Hempstead*, 409 F.3d at 132).

Disqualification is disfavored in the Second Circuit, and is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint.'" *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc*., No. 3:10CV60(JBA), 2011 WL 12910725, at *5 (D. Conn. Dec. 30, 2011) (quoting *Arista Records LLC v. Lime Group LLC*, 2011 WL 672254 (S.D.N.Y. Feb. 22, 2011)).  *See also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981). Because of the serious impact of attorney disqualification on the client's right to select counsel of his choice, "a district court must balance a client's right freely to choose his counsel against 'the need to maintain the highest standards of the profession.'" *GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010) (quoting *Hempstead Video, Inc.*, 409 F.3d at 132) (internal quotation marks omitted).

In particular, "[r]ecognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, [the Second Circuit has] indicated that such relief should ordinarily be granted only when a violation . . . poses a significant risk of trial taint." *Glueck,* 653 F.2d at 748.  *See also Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 300 (E.D.N.Y. 2009) ("[T]he disqualification of an attorney upon the motion of an adversary is a serious sanction that ought not to be imposed lightly.") (citations omitted).

37

One reason that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit" is "because they are 'often interposed for tactical reasons' and result in unnecessary delay." *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y.1991) (quoting *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1452 (S.D.N.Y.1985)). *See also Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (same). In fact, the Second Circuit has stated that it has "been loathe to separate a client from his chosen attorney," *Matter of Bohack Corp.*, 607 F.2d 258, 263 (2d Cir. 1979), especially in light of "[t]he delay and additional expense created by substitution of counsel," which "is a factor to which [it has] attached considerable significance," *id.* (citing *Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136, 1138-40 (2d Cir.1975)). *See also Giuffre v. Dershowitz,* 410 F. Supp. 3d 564, 570 (S.D.N.Y. 2019) ("Motions to disqualify are viewed with disfavor because of their vulnerability to abuse as litigation tactics.") (citation and internal quotation marks omitted).

Because  disqualification is only warranted in the rare circumstance where an attorney's conduct "poses a significant risk of trial taint," in the absence of such taint*, "*the litigation should proceed, the remedy for unethical conduct lying in the disciplinary machinery of the state and federal bar." *Bottaro v. Hatton Assocs.,* 680 F.2d 895, 896-97 (2d Cir. 1982) (citing *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980), *vacated on other grounds and remanded*, 449 U.S. 1106 (1981)).

Although doubts are to be resolved in favor of disqualification,  *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975), the party requesting disqualification bears the "heavy burden" of demonstrating that disqualification is in fact warranted,  *Evans*, 715 F.2d at 794 (citation omitted). Thus, "[a] court should review a request for disqualification with 'fairly strict scrutiny.'" *Decker*, 716 F. Supp. 2d at 231-32 (quoting *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir.

2009)).

When deciding a motion to disqualify counsel, district courts in this Circuit have considered "various sources of law, including the ABA Model Rules of Professional Conduct, the ABA Model Code of Professional Responsibility," as well as state rules of professional responsibility of the bar. *Blue Planet Software, Inc. v. Games Int'l,* LLC, 331 F. Supp. 2d 273, 275 (S.D.N.Y. 2004). However, these rules "merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification.'" *Hempstead Video, Inc.*, 409 F.3d at 132 (citing *Nyquist*, 590 F.2d at 1246). *See also Bartolini v. Mongelli*, No. 17-CV-6276-PKC-SJB, 2018 WL 2725417, at *2 (E.D.N.Y. June 5, 2018) (same).

### 2. *Witness-Advocate Rule*

In general, the "witness-advocate" rule "pertains to situations in which lawyers may be called as witnesses." *Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 303 (E.D.N.Y. 2009) (citation omitted). Within this District, Local Civil Rule 83.13 sets forth the witness-advocate rule, mandating that "[a] lawyer shall not accept employment in contemplated or pending litigation if he or she knows or it is obvious that he or she or a lawyer in the same firm ought to be called as a witness." D. Conn. L. Civ. R. 83.13(a). Furthermore, if upon undertaking employment, "a lawyer learns or it is obvious that he or she or a lawyer in the same firm ought to be called as a witness on behalf of the client, he or she shall[, absent one of the few enumerated exceptions,] withdraw from the conduct of the trial and the law firm shall not continue representation in the trial." *Id.* 83.13(b).[15]

---

[15] The exceptions to this rule are enumerated in Local Civil Rule 83.13(a) and include when the testimony will relate solely to: (1) "an uncontested matter," (2) "a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to [it];" and/or (3) "the nature and value of legal services" rendered by the lawyer to the client. D. Conn. L. Civ. R. 83.13(a)1.-3. Also, in the unforeseen circumstance that "a lawyer learns or it is obvious that he or

With respect to the witness-advocate rule, the Second Circuit has stated that the "concerns implicating the rule are that (1) the lawyer will appear to vouch for his own credibility, (2) the lawyer's testimony will put opposing counsel in a difficult position when he has to vigorously cross-examine his lawyer-adversary and seek to impeach his credibility, and (3) there may be an implication that the testifying attorney may be distorting the truth as a result of bias in favor of his client." *Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282–83 (2d Cir. 2004) (citing *Culebras Enterprises Corp. v. Rivera-Rios*, 846 F.2d 94, 99-100 (1st Cir. 1988)). Also, "[m]ost important, when one individual assumes the role of both advocate and witness it '[may] so blur[ ] the line between argument and evidence that the jury's ability to find facts is undermined.'" *Ramey,* 378 F.3d at 283 (citing *United States v. Arrington*, 867 F.2d 122, 126 (2d Cir.1989)). However, "[f]or the most part, these 'concerns are absent or, at least, greatly reduced, when . . . the lawyer-witness does not act as trial counsel.'" *Id.* (quoting *Culebras*, 846 F.2d at 100).

As to a law firm representing *itself* as a party in an action, pursuant to 28 U.S.C. § 1654, "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Therefore, a law firm "is permitted to represent itself, as well as its client, in any action where it is a [party], in the absence of some inherent conflict or other basis for disqualification." *Gabayzadeh*, 639 F. Supp. 2d at 304. *See also Bottaro*, 680 F.2d at 897 ("Members of the bar have, like all litigants, a right to select their own counsel."). The inherent conflict – *i.e.*, basis for

---

she or a lawyer in the same firm may be called as a witness *other than on behalf of his or her client,* the lawyer may continue the representation until it is apparent that his or her testimony is or may be prejudicial to the client." D. Conn. L. Civ. R. 83.13(b) (emphasis added).

disqualification – may be the difficult situation where, for example, there is the "possibility that the lawyer will enhance his or her credibility as an advocate by virtue of having taken an oath as a witness," and/or "when an opposing counsel must cross-examine a lawyer-adversary and impeach his or her credibility." *Id.*

### 3. *Defendants' Pending Motion and Arguments*

Defendants' first argument for seeking disqualification of Sergei Lemberg and other attorneys in the Plaintiff law firm is that "based on the claims and anticipated defenses, it is 'obvious' that Attorney Lemberg and/or lawyers in his law firm 'ought to be called as' witnesses within the meaning of the prohibition of Local Rule 83.13." Doc. 39-1, at 3. Defendants assert that under Rule 83.13, a lawyer is generally prohibited from appearing before the Court if that lawyer, or any other in the same firm, "ought to be called" as a witness.  Doc. 39-1, at 3 (quoting D. Conn. L. Civ. R. 83.13(a)). Specifically, under Rule 83.13(a), except in limited circumstances,  "A lawyer shall not accept employment in contemplated or pending litigation if he or she knows or it is obvious that he or she or a lawyer in the same firm ought to be called as a witness."[16]  Moreover, if after the attorney has undertaken employment "in contemplated or pending litigation," he or she "learns or it is obvious [to that lawyer] that he or she or a lawyer in the same firm ought to be called as a witness on behalf of the client, he or she shall withdraw from the conduct of the trial and the law firm shall not continue representation in the trial."  *Id.* 83.12(b).

Defendants emphasize that "the prohibition on counsel-as-witness is triggered *not* on a finding that counsel or his or her colleagues are 'certain' to be witnesses at trial, or are 'required' or

---

[16]  The exceptions to the Rule are enumerated in n.15, *supra.  See also* D. Conn. L. Civ. R. 83.13(a)1.-3.

'necessary' witnesses." Doc. 39-1, at 4. Rather, Defendants maintain, "[t]he threshold is lower: whether appearing counsel 'ought to be' a witness." *Id.* They then cite and discuss Disciplinary Rules ("DR") 5-101 and 5-102 of the American Bar Association ("ABA") Code of Professional Responsibility, which mandate that a lawyer "shall not" take on a litigation matter in which any lawyer in his/her firm "ought to be" a witness. *Id.* (citing *J.P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir. 1975) ("[A]pplication of [DR 5-101 and 5-102 of the ABA Code] does not depend on whether" counsel "will be called but whether, as the Code provides, he 'ought to be called as a witness' in the action . . . .").

With respect to the Connecticut Rules of Professional Conduct, Defendants state that in promulgating Local Civil Rule 83.13, the Judges in this District "implicitly rejected the wording of the 'Lawyer as Witness' provision in Rule 3.7 of the Connecticut Rules of Professional Conduct which superseded the CPR in 1986."[17] Doc. 39-1, at 4. The prohibitions of Rule 83.13 are thus "stricter than Rule 3.7" of the CPR in at least two respects: "(1) the prohibition on counsel-as-witness is not limited to the individual attorney who may testify but is *imputed* and *extended* to all attorneys in the firm; and (2) as indicated, the prohibition is not confined to a lawyer whose testimony is deemed 'necessary' but extended to a lawyer whose testimony '*ought to*' be considered." *Id.* at 5 (emphasis in original).[18]

Defendants argue that Lemberg Law cannot escape the prohibition of Rule 83.13, even if that

---

[17] Connecticut Rule of Professional Conduct 3.7 provides, in pertinent part, that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." Conn. R. Prof'l Cond. Rule 3.7.

[18] The Court takes judicial notice that Lemberg Law currently lists offices in six different states and names nine attorneys as its "legal team" on the firm website. *See* https://www.lemberglaw.com/about/team/; https://www.lemberglaw.com/about/where/.

firm does not designate any of its attorneys as witnesses. *Id.* (citing, *inter alia*, *Karlen v. Westport Bd. of Educ.*, No. 3:07-CV-309(CFD), 2009 WL 801632, at *2 (D. Conn. Mar. 24, 2009) (granting disqualification motion under Local Rule 83.13; finding that counsel would be "a likely witness as to material, disputed issues of fact," notwithstanding his representation that he would not "offer any testimony")). Moreover, Defendants argue, the fact that lay witnesses outside the firm may have personal knowledge of the events and transactions at issue does not remove the bar against lawyers acting as advocates and witnesses. *Id.* at 5-6 (citing *Fredericks v. Fortin*, No. CV89 28 29 10, 1994 WL 728787, at *1-2 (Conn. Super. Ct. Dec. 29, 1994) (granting motion to disqualify appearing counsel, noting that "merely because other participants … *may* be able to recall what took place, does not make [counsel's] testimony unnecessary" within the meaning of Connecticut Rule of Professional Conduct 3.7) (emphasis in original).

In addition, Defendants cite to one case outside the Circuit to assert that some courts have held that "the prohibition on appearing counsel as witness fully applies even to the pre-trial stages of litigation." Doc. 39-1, at 6 (citing *Freeman v. Vicchiarelli*, 827 F. Supp. 300, 302, 304 (D. N.J. 1993) ("The attorney-witness rule operates both during a trial and during pre-trial discovery and negotiations . . . . If the attorney-witness rule operated only at the trial stages of litigation . . . the policies inherent in [the rule] would be defeated.") (discussing New Jersey Supreme Court's interpretation of New Jersey Rule of Professional Conduct 3.7).

Furthermore, Defendants argue that given the substance underlying Plaintiff's alleged claims, it is certain that at least one of Plaintiff's attorneys "ought to be" a witness. Doc. 39-1, at 6. Defendants assert that they "plainly are entitled to examine – and thereby 'call as' witnesses – the lawyer principals of Lemberg Law." *Id.* "[T]he owners of Lemberg Law . . . obviously will have

direct and personal knowledge of a central and material factual issue: the ways in which the firm is in 'direct competition' with Defendants' Website." *Id.*  According to the Defendants, "[i]t is those owners who also will have direct knowledge of various categories of claimed economic injury to their law firm" and "those claims of injury are both material and in dispute." *Id.*  Defendants maintain that "[t]he details of the Plaintiff law firm's claimed 'good will' and 'value of its own brand' go to the very heart of Plaintiff's theories of recovery, not only with respect to whether the Lemberg firm has in fact lost revenue and had increased expenses as a result of the challenged portions of the Website,  as it claims, but also with respect to the calculation of such claimed economic damages." *Id.*

Defendants further note that "in the Report of Parties' Planning Meeting filed in this action," Defendants "specifically identified that among the subjects on which they anticipate seeking discovery will be the following: . . . the volume and distribution of Plaintiff's FDCPA clients, revenue derived therefrom, and trends over the past ten years, all for the purposes of establishing a baseline, identifying changes corresponding to creation of the Website, and evaluating whether a causal link exists between such changes and the Website." *Id.* at 6-7.  According to Defendants, "[t]he details of the Plaintiff law firm's claimed 'good will' and 'value of its own brand' go to the very heart of Plaintiff's theories of recovery." *Id*. at 6.  Moreover, Defendants maintain that it is the details of Plaintiff's alleged injuries and damages upon which the Plaintiff law firm "ought to be called as" witnesses within meaning of Local Rule 83.13.  *Id.* at 7.  Such "highly relevant" information is "peculiarly in [the] possession" of the Lemberg Law firm so its members "ought to testify." *Id.* (quoting *Kubin v. Miller*, 801 F. Supp. 1101, 1113 (S.D.N.Y. 1992)).

Furthermore, Defendants argue that the "lawyer-witness rule" must be applied where the

44

Plaintiff law firm is "seeking redress *not* for one of its clients, but for *itself*." Doc. 39-1, at 7 (emphasis in original). The principals in the firm know "how the firm has branded itself" and in what ways its "good will and brand" have allegedly been impaired by Defendants' competing Website. *Id.* (citing, *inter alia*, *Harris & Hilton, P.A. v. Rassette*, 798 S.E. 2d 154, 157 (N.C. Ct. App. 2017) (affirming disqualification of two principals of plaintiff law firm as "necessary" witnesses under local Rule 3.7 in collection actions against client). Defendants conclude that this is a case where the Plaintiff's counsel has direct knowledge of the underlying facts of the case, rather than having compiled facts through investigation in his capacity as counsel. *Id.*

With respect to tainting the trial process, Defendants remind the Court that when opposing counsel takes the stand to testify, a jury may view him as "possessing special knowledge of [the] case" and therefore accord his testimony "undue weight." *Id.* at 8 (citing *MacArthur v. Bank of New York*, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981)). Furthermore, opposing counsel may feel constrained by professional courtesy from impeaching a fellow counsel-witness. *Id.* (citations omitted). In sum, Defendants urge the Court to disqualify both Attorney Lemberg and any other attorney affiliated with the Plaintiff law firm.

### 4. *Plaintiff's Objections to Disqualification*

Plaintiff opposes disqualification of Attorney Lemberg and all attorneys affiliated with Lemberg Law LLC, arguing that Defendants have failed to satisfy the requisite "heavy burden of showing that disqualification is appropriate." Doc. 43, at 1. Plaintiff further deems Defendants' motion to disqualify as "premature at this stage in the lawsuit." *Id.*

First, in describing the burden to prove disqualification, Plaintiff asserts that courts in this Circuit have required "a high standard of proof" that indicates the "necessity for counsel to testify"

by "taking into account factors such as the significance of the matters, weight of the testimony, and availability of other evidence."  Doc. 43, at 2 (quoting *Ardemasov v. Citibank, N.A.*, 14 F. Supp. 3d 39, 46 (D. Conn. 2014)).  Plaintiff states that the testimony to be provided by counsel "must be prejudicial to the testifying attorney's client" and "sufficiently adverse to the factual assertions or account of events offered on behalf of the client" that either the bar or the client might have an interest in counsel's independence "in discrediting that testimony."  *Id.* (quoting *Ardemasov*, 14 F. Supp. 3d at 46).

With respect to this burden, Plaintiff argues that Defendants submitted no evidence to show that the owners of Lemberg Law have direct and personal knowledge of the ways in which that firm competed with Defendants and incurred the alleged damages.  *Id.* at 3.  Specifically, Defendants do not "actually identify the substance of this anticipated testimony or how such unidentified evidence would prejudice any trial."  *Id.*  Plaintiff characterizes Defendants' assertions regarding the substance of counsel's testimony as "speculation" because it has occurred "before any discovery has been exchanged and before any determination regarding which claims and what factual issues will be decided at trial."  *Id.* at 3-4 (citation omitted).

Second, Plaintiff argues that the disqualification motion is premature because there has only been limited discovery and it is unclear to what extent counsel's testimony might be necessary or prejudicial.  Doc. 43, at 2.  In particular, Plaintiff maintains that "it is entirely unclear if the case will even get to trial, let alone the scope of Plaintiff's claims and which issues will be relevant at trial or how."  *Id.* at 4.

46

### 5. *Defendants' Reply*

Defendants reply to Plaintiff's two objections to their motion to disqualify – failure to meet the "heavy burden" and prematurity – as follows.  First, they point to the text of Local Rule 83.13(a) to establish that disqualification should occur when the advocate "ought to be called as a witness," which includes circumstances when that testimony is necessary and when it is "at least 'significantly useful' to his or her client." Doc. 44, at 2 (citing *Ardemasov*, 14 F. Supp. 3d at 48-49).   In other words, the prohibition against the advocate as witness is not limited to cases in which the testimony is "necessary."  The Judges of this District rejected a standard requiring necessity of the testimony when they promulgated Rule 83.13.  *Compare* D. Conn. L. Civ. R. 83.13(a) (disqualifying counsel who "ought to be called") *with* Conn. R. Prof. Cond. 3.7(a) (disqualifying counsel "likely to be a *necessary* witness") (emphasis  added).

Furthermore, Defendants assert that because Plaintiff is a firm owned and operated by attorneys, the testimony of its principal owners will at least be "significantly useful" to make out the claims under the Lanham Act and CUTPA.  Doc. 44, at 4.  These principals are likely witnesses with personal knowledge of the alleged effect Defendants' Website had on Plaintiff's business, revenue, and losses.  *Id.*

 As to prematurity of the motion, Defendants note that the language of Local Rule 83.13 provides that counsel must be disqualified as soon as "it is obvious that he . . . ought to be called as a witness," which is now.  *Id.* at 6.  To contend otherwise – "that counsel be disqualified only from trial" – does not follow from the language set forth in Local Rule 83.13(a).  *Id.*  Unlike in advocate-witness rules of other jurisdictions, which disqualify counsel as advocate-witness from trial only, this District's rules require disqualification from the litigation entirely.  *Id.* (citing and contrasting N.Y.

R. Prof. Cond. 3.7(a) (dictating that "[a] lawyer shall not act as an advocate *before a tribunal* in a matter in which the lawyer is likely to be a witness) (emphasis added) with D. Conn. L. Civ. R. 83.13 (disqualifying an advocate in pending litigation who "ought to be called" as a witness in this matter).

Finally, Defendants emphasize that, in order to request disqualification, there is no need to establish that there will be prejudice to counsel's client. Doc. 44, at 8. Although an advocate may be disqualified due to prejudice when called to testify by his client's adversary, there is no substantial prejudice required when an advocate "ought to be called" in general. *Id.* Under Local Rule 83.13(b)(2), prejudice to a client comes to bear when it is "obvious" that the advocate will be "called as a witness *other than* on behalf of his or her client." *Id.* (citing D. Conn. L. Civ. R. 83.13(b)(2)); *Sec. Ins. Co. of Hartford v. Mendon Leasing Corp.*, No. 01 CIV. 9054 (VM) (JCF), 2002 WL 31387484, at *2 (S.D.N.Y. Oct. 22, 2002) (applying N.Y. D.R. 5-102(b) and noting that when counsel is called to testify by an adversary, the party seeking disqualification must demonstrate that it is likely that the testimony to be given by counsel is necessary and substantially likely to be prejudicial to his client). Defendants assert that Attorney Lemberg should be disqualified now because he "ought to be called" as a witness to assert Plaintiff's claims, regardless of whether, at some later stage of litigation, it becomes "obvious" that he may also need to be called by Defendants. Doc. 44, at 8-9 (citing D. Conn. L. Civ. R. 83.13(b)(2)).

### *6. Analysis*

Defendants herein  seek disqualification of Attorney Lemberg and the attorneys in Lemberg Law under Local Civil Rule 83.13(a), prohibiting an attorney from accepting employment in pending litigation if he knows or it is obvious that he or a lawyer in the same firm "ought to be called" as a witness. Doc. 39-1, at 3 (quoting D. Conn. L. Civ. R. 83.13). Given the claims set forth in Plaintiff's

Amended Complaint, violations of the Lanham Act and CUTPA resulting in unfair business competition, relevant evidence should lie within the possession and/or knowledge of Lemberg Law, including individual attorneys in that firm.  Under such circumstances, they "ought to be called" as witnesses.  *See, e.g., Sickau v. Siegel, Kelleher & Kahn*, No. 03-CV-0364A (SR), 2005 WL 6778194, at *3 (W.D.N.Y. July 26, 2005) (noting that in every case "the Court has reviewed in which disqualification was granted, the attorney who was disqualified was personally involved in underlying events of central importance to the outcome of the litigation"). That is, "[a]n attorney ought to be called as such a witness if his testimony could be significantly useful to his client." *Freight Drivers, Helpers, Dockmen & Allied Workers Local No. 375 v. Kingsway Transports, Inc.*, No. CIV-90-593E, 1991 WL 224380, at *3 (W.D.N.Y. Oct. 22, 1991) (citing *MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981)).

The issue of Sergei Lemberg's credibility may be implicated at trial by his overlapping roles as advocate and witness.  Therefore, unlike in *Bottaro v. Hatton Assocs.*, 680 F.2d 895, 897 (2d Cir. 1982), where the "lawyer [was] a [party] litigant as well as a witness, but *not* an advocate," *id*. (emphasis added), Attorney Lemberg has appeared as the sole advocate for Lemberg Law as well as being deemed a likely witness by opposing counsel.[19]  In *Bottaro*, disqualification of a law firm was denied where the plaintiff lawyer selected a law partner to represent him as trial counsel because the lawyer-witness plaintiff would not play any role in the case as an advocate himself.  *Accord Bartolini v. Mongelli*, No. 17-CV-6276-PKC-SJB, 2018 WL 2725417, at *4 (E.D.N.Y. June 5, 2018) (denying motion to disqualify counsel from representing a law partner where there was "no basis to

---

[19]  If Defendants do call Sergei Lemberg as a witness, Plaintiff may then also call him as a rebuttal witness to prove their case.  In that event, even if it were not foreseeable that he "ought" to testify, he would still have to withdraw his appearance at trial under subsection (b) of Rule 83.13.

infer, that [defendant's] law firm [would] be a witness in this case" so no attorney was "simultaneously acting as a lawyer . . . and as a witness").

In contrast to the facts in *Bottaro*, in the present case, the law firm Lemberg Law is the Plaintiff in the action so that in the event Attorney Lemberg is called to testify at trial, as Defendants anticipate, he will be acting as witness and advocate.    Moreover, Rule 83.13 expands disqualification to include the situation where  "a lawyer in the same firm ought to be called as a witness." D. Conn. L. Civ. R. 83.13(a).

Upon Attorney's Lemberg's testimony at trial, there may be problems of "taint" such as: (1) "the public might think that [he,] the lawyer (as witness)[,] is distorting the truth for the sake of the client," ( 2) [he] will "enhance his . . . credibility as an advocate by virtue of having taken an oath as a witness," and (3) "the unfair and difficult situation [might  arise[] when an opposing counsel must cross-examine [him as] a lawyer-adversary and impeach his . . .credibility." *Bottaro*, 680 F.2d at 897 (citation and internal quotation marks omitted). In addition, a jury might view Attorney Lemberg,  as "possessing special knowledge of [the] case" as counsel and accord his testimony "undue weight."  *MacArthur v. Bank of New York*, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981).

With  respect to Plaintiff's objection regarding prematurity, Plaintiff has asserted that it is simply too soon for the Court to make a determination regarding whether Lemberg should be disqualified because "it is not yet clear" whether counsel's testimony "might be necessary or prejudicial."  *See* Doc. 43, at 2.  However, even if this case remains in discovery, "[t]his is not the operative test for possible invocation of the disciplinary rule: the standard is not 'will be called' but 'ought to be called'  and that rule clearly obtains in this circuit." *Norman Norell, Inc. v. Federated Dep't Stores, Inc.*, 450 F. Supp. 127, 129 (S.D.N.Y. 1978) (quoting *J. P. Foley & Co., Inc. v.*

*Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir. 1975)).  An attorney should be disqualified if he ought to be called as a witness regardless of whether he will actually be called as a witness. *J.P. Foley & Co., Inc.*, 523 F.2d at 1359. *See also Eurocom, S. A. v. Mahoney, Cohen & Co.,* 522 F. Supp. 1179, 1181 (S.D.N.Y. 1981) ("The operative question is whether a member of the firm involved in the trial 'ought' to be called as a witness, not whether plaintiff presently plans to do so; nor does the Code make a distinction between a witness appearing in the case in chief or on rebuttal.") (citing *J. P. Foley & Co.*, 523 F.2d at 1359).

Given the substance of the claims, the Court finds unpersuasive Plaintiff's argument that it would be "speculative" to find that Lemberg ought to be called as a witness. It is clear that Lemberg or another member of his firm will have to explain the firm's practice and why the Website unfairly competes with, and thus negatively impacts, its business.  Moreover, Plaintiff's assertion  that the "case might never proceed to trial" does not bar the Court from making appropriate rulings with respect to future trial proceedings, if any.[20]  Otherwise, any case in which there existed a possibility of settlement would be stalled as the Court would be unable to make pre-trial rulings.

On the other hand, where Lemberg Law is also the Plaintiff in the case, the Court recognizes the need to balance a party's right to choose its counsel against the taint of that counsel testifying at trial.  Generally, "[m]embers of the bar have, like all litigants, a right to select their own counsel." *Bottaro*, 680 F.2d 895, 897 (2d Cir. 1982) (citing 28 U.S.C. § 1654 and *Int'l Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1295 (2d Cir. 1975)).[21]  As a principal member of Lemberg Law, Attorney

---

[20] *See* Doc.  43 (Plaintiff's Objection), at 4 (It is "unclear if the case will even get to trial, let alone the scope of Plaintiff's claims and which issues will be relevant at trial or how.").

[21] In *International Electronics*,  the Second Circuit stated:

Lemberg's role  is akin to a party acting *pro se*, which, as set forth *supra*, is sanctioned under 28 U.S.C. § 1654.  Pursuant to that statute, there is freedom to testify and also to advocate for oneself. The total loss of Lemberg's ability to act as an attorney for his firm would be significant in that he doubtless represents Lemberg Law with unique loyalty and diligence.  Plaintiff's right to select counsel must be weighed in determining whether disqualification should be granted.

Rather than simply disqualifying Attorney Lemberg, the Court exercises its discretion to rule in the interests of justice for all parties.  The Second Circuit has emphasized that a motion to disqualify "should ordinarily be granted only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint." *Glueck*, 653 F.2d at 748 (citations omitted).  Accordingly, district courts in this Circuit have repeatedly denied motions for disqualification "where the attorney in question is retained only for pre-trial purposes and does not intend to represent the client at trial." *Amusement Indus., Inc. v. Stern*, 657 F. Supp. 2d 458, 461 (S.D.N.Y. 2009) (collecting cases).  In so holding, courts have found that the concerns implicating the witness-advocate rule are not implicated when an attorney works "behind-the-scenes" on pretrial matters.

There is no "trial taint" engendered by allowing counsel to engage in discovery and/or settlement negotiations.   *See, e.g., ProBatter Sports, LLC v. Sports Tutor, Inc.*, No. 3:05CV1975(VLB), 2013 WL 12250067, at *2–3 (D. Conn. Mar. 22, 2013) (If counsel is "not also

---

It is implicit that a lay party may not only try his own case but also testify on his own behalf. We do not think that because he is a lawyer he should be deprived of that right. By the same token, he should be entitled to counsel of his own selection, including a law firm of which he was formerly a partner. *We need not now decide, however, whether this would be the rule if [plaintiff] were still a member of the firm.*

527 F.2d at 1295 (emphasis added).

seen to perform in the high visibility position of trial counsel," the appearance to jurors that he may be distorting the truth is diminished; and "there is no danger that the lawyer-witness might inject his or her personal belief into the advocate's argument to the jury."); *Conigliaro v. Horace Mann School*, 95 Civ. 3555 (CSH), 1997 WL 189058, at *4 (S.D.N.Y. Apr. 17, 1997) (holding attorney who may be called as trial witness is entitled to participate in pretrial proceedings under appropriate circumstances); *Amusement Indus., Inc.*, 657 F. Supp. 2d at 461 ("The rationale for this result is that the concerns underlying [the advocate-witness rule] arise out of an attorney's presence at trial. Allowing an attorney to continue his representation pre-trial does nothing to undermine those interests, and protects the clients' right to choose their own counsel.") (citation and internal quotation marks omitted); *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 160 F. Supp. 2d 657, 665 (S.D.N.Y 2001)[22] (following the "great weight" of authority among district courts which "permitted attorneys who were potential witnesses at trial to continue to represent their clients during pre-trial proceedings") (collecting cases); *Ragdoll Prods. (UK) Ltd. v. Wal-Mart Stores, Inc.*, No. 99 CIV. 2101 DLC, 1999 WL 760209, at *2 (S.D.N.Y. Sept. 27, 1999)  ("[T]he concerns of DR 5–102(A) and (B) 'arise out of an attorney's presence at trial' and [are] not implicated . . . by permitting the attorney to represent the client prior to trial;" this "protect[s] the clients' right to chose their own counsel") (citing *Conigliaro*, 1997 WL 189058, at *4).

However, because Plaintiff has demanded a jury trial, in order to avoid taint arising in the trial proceedings, this Court will order that Sergei Lemberg, and any other member of Lemberg Law who might enter an appearance,  be disqualified from acting  *as trial counsel* for the Plaintiff firm. Plaintiff's right to select counsel is subject to other rules, including Local Civil Rule 83.13, which

---

[22] *Overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

places a "prohibition on counsel as witness" where counsel knows or it is obvious that he "ought to be called as a witness."  D. Conn. L. Civ. R. 83.13(a), (b).  Said Rule binds counsel regarding his professional conduct and avoids tainting the trial.

Nonetheless, acting with the Second Circuit's preferred   "restrained approach" to disqualification, *Bottaro*, 680 F.2d at 896, and protecting Lemberg Law's interest in selecting its own counsel under  28 U.S.C. § 1654, the Court holds that Attorney Lemberg  may continue to participate in representing Lemberg Law throughout the *pretrial activities*, including discovery, but should also secure independent counsel as soon as possible.

Independent counsel is necessary because, as one court in this Circuit noted, "the awkwardness that would result at trial is not the only or even the central reason for disqualification under the advocate-witness rule." *Rizzuto v. De Blasio*, No. 17CV7381ILGST, 2019 WL 1433067, at *8 (E.D.N.Y. Mar. 29, 2019).  Rather, "[t]he fundamental justification for the rule is to preserve the integrity of the judicial system and the adversary process by ensuring the objective, professional representation of parties before the court." *Id.* (citing *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009)).  *See also Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (noting that the court's authority to disqualify counsel arises from its need to "maintain the highest standards of the profession" among practitioners appearing before it).

Similarly, it may seem facially plausible to argue that "the Court can cure the advocate-witness problem in this case by holding a bench trial instead of a jury trial." *Rizzuto*, 2019 WL 1433067, at *8.  If Plaintiff were willing to waive its demand for a jury trial, the judge would become the finder of fact and "would . . . likely . . . be able to comprehend this dual role where the jury would be overwhelmed with confusion." *Id.* However, as discussed in *Rizzuto*, "conducting a

bench trial" cannot always cure the "advocate-witness" issue:

> The purpose of disqualification under the rule is not merely logistical, but is to ensure that the attorney can provide representation that is uncompromised by his involvement in the underlying facts of the case, preserving his objectivity and the integrity of the adversary process.

*Id.* (citing *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 56 (S.D.N.Y. 2017)).  *See also Ardemasov v. Citibank, N.A.*, 14 F. Supp. 3d 39, 48 (D. Conn. 2014) ("An advocate who also ought to be called as a witness hurts his client because the advocate's ability to objectively assess his client's case may become clouded.") (citation and internal quotation marks omitted).  Sergei Lemberg is not an individual litigant in the case, but rather counsel for a legal entity, the  law firm Lemberg Law LLC.  By being called to testify about his personal knowledge of the facts, he might find it difficult to maintain his objectivity and professionalism on behalf of his client.[23]

After all, "[i]f a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness." *MacArthur v. Bank of New York*, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981) (quoting "Ethical Consideration 5-9" ("EC 5-9") of American Bar Association Committee on Ethics and Professional Responsibility, Formal Opinion 339 (Jan. 31, 1975)).  Moreover, "[a]n advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility."  *Id.* (quoting EC 5-9).  Thus, regardless of the fact that counsel's interests lie on the same side of the action as those of his client, "[t]he roles of an advocate and of

---

[23] *See, e.g., Gasoline Expressway, Inc. v. Sun Oil Co.*, 64 A.D.2d 647, 407 N.Y.S.2d 64 (2d Dep't 1978) ("Mr. Harris is not an individual litigant; the corporation of which he is a major shareholder is the plaintiff. Neither Mr. Harris' stock ownership, nor his status as an officer, grants the corporation an individual right to select its own counsel when such selection is clearly contrary to the Code of Professional Responsibility."), *aff'd*, 47 N.Y.2d 847, 392 N.E.2d 572, 418 N.Y.S.2d 585 (1979) (per curiam).

a witness are inconsistent; the function of an advocate is to advance or argue the cause of [the party he represents], while that of a witness is to state facts objectively." *Id.* (quoting EC 5-9).

Therefore, to preserve the integrity of the trial process –  to ensure that counsel is able to exercise independent judgment and professionalism on Plaintiff's behalf –  when the case becomes ready for trial, Attorney Lemberg will designate in Lemberg Law's  pre-trial memorandum the individual or firm who will represent Plaintiff at trial.  Thereafter, neither Lemberg nor any member of Lemberg Law shall take an active role in conducting the case in the courtroom.  This will allow Lemberg Law to have the benefit of Attorney Lemberg's  litigation skills and diligence in the preliminary phases of the case,  but prevent the potential taint of him acting as both advocate and witness at trial.

### III. CONCLUSION

As discussed above, Defendants' "Motion to Dismiss" [Doc. 20] both Counts I and II of the Complaint are DENIED and Defendants' "Motion to Disqualify Appearing Counsel for Plaintiff" [Doc. 39] is GRANTED IN PART AND DENIED IN PART.

With respect to Defendants' "Motion to Dismiss" under Federal Civil Rule 12(b)(6), the Court has examined the Complaint to determine whether it contains "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the case at bar, both of Plaintiff's claims state plausible claims.

Plaintiff's first Count states a plausible claim for "false advertising" in violation of Section 43(a) of the Lanham Act.  In the Second Circuit, to state such a claim, a plaintiff must demonstrate that the statement in the advertisement is false – either literally false or likely to deceive or confuse customers. *Merck*, 760 F.3d at 255.  In addition, the plaintiff must allege that the misrepresentation

involved an inherent quality of the product, defendant placed the misleading statement in interstate commerce, and the plaintiff was injured as a result. *Id.* In the instant case, Plaintiff has alleged all of these elements. The Google ads and Website at issue allegedly misled consumers regarding the identity of the service providers for assistance with FDCPA clalims, the ads and site were on the internet, and the Plaintiff lost, *inter alia*, revenue and consumers as a result. Accepting all of Plaintiff's well-pled allegations of consumer confusion as true at this time, the motion to dismiss the "false advertising" claim is DENIED.

In addition, upon examination under Rule 12(b)(6), the Court finds that Plaintiff's second Count under CUTPA is also plausible. Whether Defendants' representations on their Website were likely to mislead consumers as to the "quality and/or characteristics of Defendants' services", Doc. 19, ¶ 55, thereby creating an unfair or deceptive advertising practice, is "a question of fact that is not readily susceptible to resolution on a motion to dismiss." *Edwards*, 120 F. Supp. 3d at 142 (citation omitted). *See also Naples*, 295 Conn. at 228, 990 A.2d 326 (recognizing that "it is well settled that whether a defendant's acts constitute ... deceptive or unfair trade practices under CUTPA ... is a question of fact") (citation and internal quotation marks omitted). For the foregoing reasons, Defendants' Motion to Dismiss [Doc. 20] is DENIED in its entirety.

Regarding Defendants' "Motion to Disqualify," because Attorney Sergei Lemberg "ought to" testify in this action, given the nature of Lemberg Law's pending claims, the motion is GRANTED in part. Sergei Lemberg is hereby DISQUALIFIED from acting *as trial counsel* in this case pursuant to Local Civil Rule 83.13(a).[24] However, in light of his status as founder of the Plaintiff law firm,

---

[24] Likewise, the other members of Lemberg law "shall not accept employment in . . . [this] pending litigation" in light of the fact that Sergei Lemberg and/or other members of Lemberg Law "ought to be called as a witness" in this matter. D. Conn. L. Civ. R. 83.13(a).

his representation in this action is akin to *pro se* representation under 28 U.S.C. § 1654, which suggests Plaintiff has chosen his advocacy due to his unique loyalty and diligence.  In the interests of justice, the Court will therefore allow him to participate as counsel in the *pre-trial phases* of this litigation.  This will be beneficial to his client and yet remove the possibility that he will taint the subsequent trial by acting as advocate-witness.

Therefore, on or before the date the joint pre-trial memorandum is due, Attorney Lemberg will file with the Court the name(s) of counsel who will represent Plaintiff at trial; and neither he nor any attorney in his firm will act as counsel in any way or conduct the proceedings *at trial*.  In addition, the designated trial counsel must file an appearance on behalf of Plaintiff on or before the date the parties file their joint pre-trial memorandum.

Finally, Plaintiff Lemberg Law is directed to find replacement counsel at its earliest convenience.  Said counsel may assist in any remaining discovery and become prepared for trial, thereby preventing delay in the proceedings as the case approaches the stage of trial readiness.  Given the notice in this Ruling, and absent "good cause," the Court will look with disfavor upon requested extensions to obtain replacement counsel.

In light of the resolution of all pending motions, the Court ORDERS the parties to submit a joint status report on or before **June 15, 2020**, updating the Court regarding the status of discovery and proposing dates for the remaining deadlines in the case.  In addition, on or before **June 22, 2020**, the parties may, if they be so advised, request resumption of their settlement negotiations by filing a joint motion for referral to Magistrate Judge Merriam for that purpose.  The Court will

thereafter set the necessary deadlines for resolution of this matter.

It is SO ORDERED.

Signed: New Haven, Connecticut
May 29, 2020

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge